1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MARILYN DILLARD, et al.,

11              Plaintiffs,              No. 2:08-cv-01339 KJM[1] KJN PS

12         v.

13   VICTORIA M. MORTON
     ENTERPRISES, INC., et al.,
14
                Defendants.
15   _____

16   RUTH GALTIERI-CARLSON, et al.,

17              Plaintiffs,              No. 2:08-cv-01777 KJM KJN PS

18         v.

19   VICTORIA M. MORTON
     ENTERPRISES, INC., et al.,
20
21              Defendants.             FINDINGS AND RECOMMENDATIONS

22   _____/

23   _____

24         [1]  United States District Judge Kimberly J. Mueller was recently assigned as the district
     judge presiding over these related actions.  (See Order of Reassignment, Feb. 3, 2011, Dillard, et
25   al. v. Victoria M. Morton Enterprises, Inc., et al., No. 2:08-cv-1339 KJM KJN PS, Dkt. No. 63;
     Order of Reassignment, Jan. 21, 2011, Galtieri-Carlson, et al. v. Victoria M. Morton Enterprises,
26   Inc., et al., No. 2:08-cv-1777 KJM KJN PS, Dkt. No. 49.)

                                         1

Presently before the court is a "Motion to Strike Defendants' Answer and Continued Application for Default Judgment," which was filed by plaintiffs in both above-captioned actions.[2]  (Dillard, et al. v. Victoria M. Morton Enterprises, Inc., et al., No. 2:08-cv-1339 KJM KJN PS ("Dillard"), Dkt. No. 54; Galtieri-Carlson, et al. v. Victoria M. Morton Enterprises, Inc., et al., No. 2:08-cv-1777 KJM KJN PS ("Galtieri-Carlson"), Dkt. No. 40.)  As discussed below, the undersigned previously denied applications for default judgment in both cases because of deficiencies largely related to the damages sought, but the denials were without prejudice.  (Order, Apr. 23, 2010, Dillard, Dkt. No. 51; Order, Apr. 23, 2010, Galtieri-Carlson, Dkt. No. 36.)  The plaintiffs' respective continued applications for default judgment remain before the court, and are the subject of these proposed findings and recommendations.[3]  At this point in the proceedings, each set of plaintiffs seeks a default judgment against the same set of defendants—defendants Victoria M. Morton Enterprises, Inc., Suddenly Slender, and Suddenly Slender International—and seeks an award of $2 million dollars as to each named plaintiff in each action.[4]

---

[2]  These actions are related, but not consolidated.

[3]  The undersigned resolved plaintiffs' motions to strike in a previously entered order. (Order, Aug. 26, 2010, Dillard, Dkt. No. 59; Order, Aug. 26, 2010, Galtieri-Carlson, Dkt. No. 45.)

[4]  Victoria M. Morton, who was previously named as an individual defendant in both actions, was dismissed from both actions without prejudice.  (Order, June 29, 2010, Dillard, Dkt. No. 56; Order, June 29, 2010, Galtieri-Carlson, Dkt. No. 42.)  Morton is not the subject of the continued applications for default judgment.  In regards to the Galtieri-Carlson matter, the only remaining defendants are those identified above.  As to the Dillard matter, the following, remaining defendants were previously dismissed by stipulation of the parties: Personal Beauty Unlimited, Inc., Research Foundation for Biochemistry and Nutrition Corp., and Hot Ticket Enterprises, Inc.  (Order, Aug. 12, 2008, Dkt. No. 10.)  Additionally, the Dillard plaintiffs have clarified that they do not intend to proceed against defendant Pyramid Consulting and Investment Co., and are not seeking a default judgment against that defendant.  (See Aff. of R. Parker White in Supp. of Application for Default J. ¶ 3, Dillard, Dkt. No. 54, Doc. No. 54-2 ("Defendant PYRAMID CONSULTING AND INVESTMENT CO., is no longer included as a defendant in this matter.  They [sic] were included in the initial moving papers due to a clerical oversight.  Accordingly, Plaintiffs do not request default judgment against Defendant PYRAMID CONSULTING AND INVESTMENT CO.").)

On September 29, 2010, the undersigned conducted a "prove-up" hearing in both cases regarding the plaintiffs' respective claims for damages.  Attorneys R. Parker White, Jeffrey D. Fulton, and William L. Brelsford, Jr. appeared on behalf of all of the plaintiffs.  None of the defendants or their representatives appeared at the prove-up hearing.

In regards to the <u>Dillard</u> matter, plaintiffs Marilyn Dillard and Stephen Dillard testified at the prove-up hearing, and Marilyn Dillard also testified on behalf of two minor plaintiffs, Ciera and Ariel Dillard, who are the children of Marilyn and Stephen Dillard.[5]  As to the <u>Galtieri-Carlson</u> matter, plaintiffs Ruth Galtieri-Carlson and Deana Galtieri testified, and Deana Galtieri also testified on behalf of minor plaintiff Christian Galtieri-Brown, who is Deana Galtieri's son.[6]  Although given repeated opportunities to submit documentary evidence in support of their claims for damages, none of the plaintiffs did so and, instead, plaintiffs in both actions seek only general damages in reliance on the testimony provided at the prove-up hearing and the previously filed declarations of the plaintiffs.

The undersigned has considered the briefs, oral arguments of counsel, testimony provided at the prove-up hearing, and the record in this case and, for the reasons stated below, recommends that plaintiffs' applications for default judgment in both the <u>Dillard</u> and <u>Galtieri-Carlson</u> matters be granted.  The undersigned recommends an award of general damages to each plaintiff as discussed below.

I.    <u>BACKGROUND</u>

Both of these products liability actions involve, as a general matter, personal injuries allegedly suffered by plaintiffs as a result of their exposure to the same "body wrap" products designed, manufactured, distributed, and/or licensed by defendants in each action.  In a previously entered, 30-page order denying the initial application for default judgment filed by

---

[5]  Elaine Garcia is the guardian ad litem for minor plaintiffs Ciera and Ariel Dillard. Neither Ms. Garcia nor the minor plaintiffs were present in the courtroom.

[6]  Deana Galtieri is the guardian ad litem for Christian Galtieri-Brown.

3

1   plaintiffs, the undersigned recounted in detail the allegations in the operative complaints in each

2   action and the procedural histories of these cases.  For the sake of brevity, that April 23, 2010

3   order is incorporated here by reference.  (See Order, Apr. 23, 2010, Dillard, Dkt. No. 51; Order,

4   Apr. 23, 2010, Galtieri-Carlson, Dkt. No. 36.)

5           Briefly stated, plaintiffs in the above-captioned actions, which are related but

6   unconsolidated, jointly applied for entry of default judgment against various defendants who at

7   one point in the litigation appeared but ceased defending themselves in the litigation.  On

8   April 23, 2010, the undersigned denied plaintiffs' joint application due to several deficiencies

9   contained therein.  (Order, Apr. 23, 2010, Dillard, Dkt. No. 51; Order, Apr. 23, 2010, Galtieri-

10  Carlson, Dkt. No. 36.)  Although the undersigned concluded that the entry of default judgments

11  in both cases was likely warranted under the relevant legal standards, plaintiffs' imprecise and

12  expedient application for default judgment was deficient in several respects, mostly related to the

13  legal and factual basis for the damages award sought.[7]  The undersigned denied plaintiffs' joint

14  application for default judgment without prejudice and provided plaintiffs in both actions 60 days

15  to, among other things, "file supplemental materials, including supplemental declarations and a

16  memorandum of points and authorities, legally and factually substantiating a precise request for

17  damages on behalf of each of the plaintiffs . . . and addressing the court's substantive concerns."

18  (See Order, Apr. 23, 2010, at 29, Dillard, Dkt. No. 51; accord Order, Apr. 23, 2010, at 30,

19  Galtieri-Carlson, Dkt. No. 36.)

20          In response to the court's April 23, 2010 order, plaintiffs in both actions filed the

21  identical pending "Continued Application for Default Judgment" and a related declaration of R.

22  Parker White in support ("White Declaration").  Rather than address the court's detailed

23

24          [7]  Although plaintiffs initially sought a collective award of $2 million dollars on behalf of
    all plaintiffs in both actions, each plaintiff in each case now seeks $2 million dollars in general
25  damages.  (Compare Application for Default J. By Court ¶ 4, Dillard, Dkt. No. 44, with Aff. of
    R. Parker White in Supp. of Application for Default J. ¶ 2, Dillard, Dkt. No. 54, Doc. No. 54-2,
26  and Galtieri-Carlson, Dkt. No. 40, Doc. No. 40-2.)

                                                    4

1   concerns regarding, among others, the legal and factual basis for plaintiffs' respective requests

2   for damages in each case, the White Declaration simply states, in relevant part:

3            2.  In response to the Court's order dated April 23, 2010, Plaintiffs request
         a default judgment in the amount of $2,000,000.00 each, based on the
4        papers already submitted before the Court.  Additionally, Plaintiffs request
         a prove-up hearing and will submit to examination before the Court and
5        *will submit medical records* already obtained on behalf of Plaintiffs.  At
         this stage of the litigation, because Defendants have failed to participate in
6        discovery, Plaintiffs cannot justify the expense of submitting experts
         before the Court in support of Plaintiffs request for default judgments
7        against Defendants.

8   (White Decl. ¶ 2, Dillard, Dkt. No. 54, Doc. No. 54-2, and Galtieri-Carlson, Dkt. No. 40, Doc.

9   No. 40-2) (emphasis added.)[8]

10            The undersigned granted plaintiffs' request for a "prove-up hearing" in each case,

11  and subsequently conducted that hearing on September 29, 2010.  In granting the prove-up

12  hearing, the undersigned stated:

13            The undersigned will grant plaintiffs' request for a "prove-up
         hearing" in each case, and will specially set that hearing.  However, the
14       undersigned notes that plaintiffs' counsel's generalized one-paragraph
         response to the court's 30-page order, which highlighted serious and
15       specific concerns about the viability of plaintiffs' entitlement to damages
         in each case, is troubling.  It illustrates plaintiffs' counsel's unwillingness
16       to invest the time and effort required to legally and factually substantiate
         plaintiffs' collective claim for . . . damages.  For example, a prove-up
17       hearing, as opposed to an organized and detailed memorandum of points
         and authorities supported by declarations and documentary evidence, will
18       not provide the court with plaintiffs' precise request for damages and the
         legal basis for the award of specific categories or types of damages.  It
19       appears plaintiffs' counsel would prefer to simply submit testimony and
         evidence to the court and leave it to the court to determine the legal basis
20       for the damages sought and the amount of damages.  Plaintiffs are entitled
         to take their chances with this less-than-ideal approach, which is the same
21       approach that led to the court's initial denial of plaintiffs' deficient
         application for default judgment.  Nevertheless, although the court will
22       grant plaintiffs in both cases their requested prove-up hearing, it will
         permit plaintiffs in each case to submit memoranda points and authorities
23       and supporting declarations, as discussed in the court's April 23, 2010
         orders, prior to the prove-up hearing.
24

25
             [8] As noted below, however, both before and at the evidentiary hearing the plaintiff
26  declined to submit any of plaintiffs' medical records or documentation.

5

1  (Order, July 27, 2010, at 3-4 (footnote omitted), <u>Dillard</u>, Dkt. No. 57; Order, July 21, 2010, at 3-4

2  (footnote omitted), <u>Galtieri-Carlson</u>, Dkt. No. 43.)  Although the court provided plaintiffs with

3  repeated opportunities to file memoranda of points and authorities in support of their damages

4  requests and to submit medical records in advance of the prove-up hearing, none of the plaintiffs

5  submitted memoranda or documentary evidence substantiating the damages sought, except for

6  redundant declarations of plaintiffs that the undersigned already found to be of only limited

7  assistance as to damages.

8           At the prove-up hearing, the undersigned raised an additional concern regarding

9  whether plaintiffs had adequately established through their pleadings that plaintiffs' exposure to

10  the body wrap products caused the injuries allegedly suffered by plaintiffs.  The undersigned

11  provided plaintiffs with an opportunity to submit supplemental briefs as to this issue, and

12  plaintiffs in both cases did so.  (Suppl. Br. In Supp. of Pls.' Application for Default J. By Court,

13  <u>Dillard</u>, Dkt. No. 62; Suppl. Br. In Supp. of Pls.' Application for Default J. By Court, <u>Galtieri-</u>

14  <u>Carlson</u>, Dkt. No. 48.)  Plaintiffs' counsel made clear at the prove-up hearing and in the most-

15  recent supplemental briefing that "[e]ach plaintiff's individual request for judgment in the

16  amount of $2,000,000 is based on general damages as a result of the physical and emotional

17  harms each Plaintiff has suffered due to exposure to [defendants'] products."  (<u>Id</u>.)

18  II.    <u>LEGAL STANDARDS</u>

19           Pursuant to Federal Rule of Civil Procedure 55, default may be entered against a

20  party against whom a judgment for affirmative relief is sought who fails to plead or otherwise

21  defend against the action.  <u>See</u> Fed. R. Civ. P. 55(a).  However, "[a] defendant's default does not

22  automatically entitle the plaintiff to a court-ordered judgment."  <u>PepsiCo, Inc. v. Cal. Sec. Cans</u>,

23  238 F. Supp. 2d 1172, 1174 (C.D. Cal. 2002) (citing <u>Draper v. Coombs</u>, 792 F.2d 915, 924-25

24  (9th Cir. 1986)).  Instead, the decision to grant or deny an application for default judgment lies

25  within the district court's sound discretion.  <u>Aldabe v. Aldabe</u>, 616 F.2d 1089, 1092 (9th Cir.

26  1980).  In making this determination, the court considers the following factors:

1    (1) the possibility of prejudice to the plaintiff, (2) the merits of
     plaintiff's substantive claim, (3) the sufficiency of the complaint,
2    (4) the sum of money at stake in the action; (5) the possibility of a
     dispute concerning material facts; (6) whether the default was due
3    to excusable neglect, and (7) the strong policy underlying the
     Federal Rules of Civil Procedure favoring decisions on the merits.
4

5  Eitel v. McCool, 782 F.2d 1470, 1471-72 (9th Cir. 1986).  Default judgments are ordinarily

6  disfavored.  Id. at 1472.

7          As a general rule, once default is entered, well-pleaded factual allegations in the

8  operative complaint are taken as true, except for those allegations relating to damages.

9  TeleVideo Sys., Inc. v. Heidenthal, 826 F.2d 915, 917-18 (9th Cir. 1987) (per curiam) (citing

10  Geddes v. United Fin. Group, 559 F.2d 557, 560 (9th Cir. 1977) (per curiam)); accord Fair

11  Housing of Marin v. Combs, 285 F.3d 899, 906 (9th Cir. 2002).  In addition, although well-

12  pleaded allegations in the complaint are admitted by a defendant's failure to respond, "necessary

13  facts not contained in the pleadings, and claims which are legally insufficient, are not established

14  by default."  Cripps v. Life Ins. Co. of N. Am., 980 F.2d 1261, 1267 (9th Cir. 1992) (citing

15  Danning v. Lavine, 572 F.2d 1386, 1388 (9th Cir. 1978)); accord DIRECTV, Inc. v. Hoa Huynh,

16  503 F.3d 847, 854 (9th Cir. 2007) (stating that a defendant does not admit facts that are not well-

17  pled or conclusions of law); Abney v. Alameida, 334 F. Supp. 2d 1221, 1235 (S.D. Cal. 2004)

18  ("[A] default judgment may not be entered on a legally insufficient claim.").  A party's default

19  conclusively establishes that party's liability, although it does not establish the amount of

20  damages.  Geddes, 559 F.2d at 560 (stating that although a default established liability, it did not

21  establish the extent of the damages); cf. Adriana Int'l Corp. v. Thoeren, 913 F.2d 1406, 1414 (9th

22  Cir. 1990) (stating in the context of a default entered pursuant to Federal Rule of Civil Procedure

23  37 that the default conclusively established the liability of the defaulting party).

24  III.    DISCUSSION

25          A.    The Entry of Default Judgment is Appropriate In Both Cases

26                  In the order entered April 23, 2010, the undersigned evaluated plaintiffs'

7

applications for default judgment under the factors set forth in <u>Eitel</u>.  (<u>See</u> Order, Apr. 23, 2010, at 13-27, <u>Dillard</u>, Dkt. No. 51; Order, Apr. 23, 2010, at 13-27, <u>Galtieri-Carlson</u>, Dkt. No. 36.) The undersigned concluded that plaintiffs in each case were entitled to a default judgment, but that issues pertaining to damages and other procedural issues were so poorly presented in the moving papers that default judgments could not be entered at that time.  Insofar as the <u>Eitel</u> factors are concerned, the undersigned concluded that all but one of the factors favored the entry of default judgments.  However, the undersigned raised two points of concern as to the <u>Eitel</u> factors that are further addressed below.

First, as to the fourth <u>Eitel</u> factor, which considers the amount of money at stake in relation to the seriousness of defendants' conduct, the undersigned concluded that the lack of clarity in regards to plaintiffs' request for damages precluded proper evaluation of the fourth factor.  (<u>See</u> Order, Apr. 23, 2010, at 23-24, <u>Dillard</u>, Dkt. No. 51; Order, Apr. 23, 2010, at 23-24, <u>Galtieri-Carlson</u>, Dkt. No. 36.)  However, since the entry of that order, plaintiffs have clarified that each plaintiff seeks two million dollars in general damages.  Given the seriousness of the conduct alleged by plaintiffs, the undersigned concludes that the fourth <u>Eitel</u> factor favors the grant of default judgments in both cases.  Whether each plaintiff is entitled to $2 million dollars in general damages is an entirely different question, which is addressed below.

Second, the undersigned expressed concern in the April 23, 2010 order in regards to the fifth <u>Eitel</u> factor, which inquires into the possibility of a dispute concerning material facts, because the defaulting defendants had filed answers in both actions prior to having a clerk's default entered against them.[9]  (<u>See</u> Order, Apr. 23, 2010, at 24-25, <u>Dillard</u>, Dkt. No. 51; Order, Apr. 23, 2010, at 24-25, <u>Galtieri-Carlson</u>, Dkt. No. 36.)  This peculiar circumstance arose because the defaulting corporate defendants initially appeared in this action and filed an answer through counsel, but later defaulted after their counsel withdrew from the representation and left

---

[9]  Nevertheless, the undersigned concluded in that order that the fifth <u>Eitel</u> factor still favored entering default judgments for the reasons stated therein.

the corporate defendants unable to appear in this court.  In any event, the undersigned's concerns

regarding potentially disputed materials facts have been alleviated because, on August 26, 2010,

the court granted plaintiffs' motions to strike the answers at issue.  (Order, Aug. 26, 2010,

Dillard, Dkt. No. 59; Order, Aug. 26, 2010, Galtieri-Carlson, Dkt. No. 45.)  Accordingly, the

fifth Eitel factor favors entering default judgments in both cases.

As noted above, the undersigned raised an additional concern at the prove-up

hearing regarding whether plaintiffs had adequately established that plaintiffs' exposure to

defendants' products proximately caused each plaintiff's extensive list of alleged ailments.  In

this case, the operative complaints and declarations submitted on each plaintiff's behalf allege

that exposure to defendants' products caused plaintiffs injuries ranging from memory loss, to a

miscarriage, and numerous other physical and emotional maladies.  Yet, plaintiffs have provided

no evidence of a direct link between the products at issue and the symptoms allegedly experience

by plaintiffs—indeed, plaintiff were unable to testify at the prove-up hearing that any medical

professional opined that any or all of the alleged injuries were necessarily caused by exposure to

defendants' products and were not caused by some other source.[10]

Although many of plaintiffs' allegations of injury seem inherently implausible

and, to say the least, give the undersigned pause, plaintiffs properly refer the court to the Second

Circuit Court of Appeals's decision in Greyhound ExhibitGroup, Inc. v. E.L.U.L. Realty Group,

973 F.2d 155 (2d Cir. 1992), cert. denied, 506 U.S. 1080 (1993) ("Greyhound"), which addresses

the causation issue at hand.

In Greyhound, a commercial tenant of a warehouse property suffered financial

injury as a result of a warehouse fire and sued its landlord for negligent maintenance of the

warehouse's fire sprinkler system.  Briefly stated, the landlord defaulted, and the district court

---

[10]  Similarly, at the evidentiary hearing, plaintiffs' counsel indicated that they had some
information that the defendants' products consisted primarily of epsom salts or magnesium
which allegedly can cause symptoms similar to those experienced by plaintiffs, but counsel
declined to provide any of that information or documentation to the court.

1  subsequently conducted a hearing on the question of damages.  At a hearing regarding damages,

2  the landlord sought to introduce evidence of the tenant's comparative fault and a resulting set-off

3  of damages, but the district court denied that request.  The Court of Appeals affirmed the district

4  court's decision.  On appeal, the landlord argued that the tenant was obligated to show that the

5  landlord's actions were the proximate cause of the damages claimed by the tenant.  Albeit over

6  one judge's vigorous dissent, the panel rejected the landlord's argument insofar as the issue of

7  liability was concerned because requiring the tenant to prove proximate cause would undermine

8  the principal pertaining to default judgments that well-pled allegations are taken as true except as

9  they pertain to the amount of damages.  The Court of Appeals reasoned:

10       There is a categorical distinction between the element "proximate cause,"
     as it pertains to the assignment of liability in the first instance, and

11       "proximate cause" as it relates to the ministerial calculation of damages in
     the context of a default judgment.  With regard to liability, the concept of

12       proximate cause supplies the legal nexus between act and injury, and
     provides a necessary basis for awarding compensation.  Where it is

13       properly alleged in a complaint, proximate cause—going to liability—is
     completely and irrefutably established upon the defendant's default.

14

15  Id. at 159.  Although it does not appear that the Ninth Circuit Court of Appeals has expressly

16  addressed the issue presented in Greyhound, several district courts in California have cited

17  Greyhound for the proposition that where proximate cause is properly alleged in the complaint,

18  proximate cause is established for the purpose of evaluating liability, and a plaintiff must only

19  prove that the compensation sought relates to the damages that naturally flow from the injuries

20  pled.  See, e.g., Philip Morris USA, Inc. v. Castworld Prods., Inc., 219 F.R.D. 494, 498 (C.D.

21  Cal. 2003) ("If proximate cause is properly alleged in the complaint, it is admitted upon default.

22  Injury is established and plaintiff need prove only that the compensation sought relates to the

23  damages that naturally flow from the injuries pled.") (citation omitted, emphasis added); accord

24  Lehman Brothers Hldgs., Inc. v. Home Capital Funding, No. 09cv859 WQH (BLM), 2010 WL

25  1904871, at *2 (S.D. Cal. May 12, 2010) (unpublished) (same); Elektra Entmt. Group, Inc. v.

26  Bryant, No. CV 03-6381GAF(JTLX), 2004 WL 783123, at *2 (C.D. Cal. Feb. 13, 2004)

1    (unpublished) (same).  On the basis of these cases, the undersigned concludes that plaintiffs'

2    respective operative complaints adequately establish proximate cause with respect to liability.

3    The extent of damages that plaintiffs are entitled to, which depends on the evidence submitted by

4    plaintiffs, is a separate question addressed below.

5            For the reasons stated above and in the April 23, 2010 order, the undersigned

6    recommends that default judgments be entered in the <u>Dillard</u> and <u>Galtieri-Carlson</u> actions,

7    respectively, jointly and severally against defendants Victoria M. Morton Enterprises, Inc.,

8    Suddenly Slender, and Suddenly Slender International.  The undersigned next addresses the

9    amount of the judgment to be awarded.

10           B.      The Measure of General Damages

11           In connection with their continued applications for default judgments, plaintiffs

12   seek an award of "general damages" in the amount of $2 million dollars as to each plaintiff in

13   each case.  As noted above, plaintiffs rely only on their previously submitted declarations and the

14   testimony of some of the plaintiffs at the prove-up hearing as support for the damages sought.

15   Plaintiffs declined to present any documentation that might inform the extent of the alleged

16   injuries suffered, such as medical records or billing statements, and offered no expert testimony

17   or testimony of treating physicians in support of their estimate of damages.  Moreover, plaintiffs

18   have filed no memoranda of points and authorities justifying an award of "general damages" or

19   identifying categories of damages that inform the calculation of such general damages.

20   Similarly, plaintiffs offer no justification for seeking the same amount of general damages on

21   behalf of every single plaintiff, despite the fact that the degree of injury alleged by each plaintiff

22   varies widely.  In short, plaintiffs appear to have selected the damages figure of $2 million

23   dollars per plaintiff out of thin air.

24           Under California law, which applies in this diversity jurisdiction case, the

25   measure of damages in a tort action is "the amount which will compensate for all the detriment

26   proximately caused thereby, whether it could have been anticipated or not."  Cal. Civ. Code

1 § 3333.  General damages may be generally categorized as "those losses which naturally flow

2 from the injury and which are not quantifiable by reference to bills or receipts."  See Beeman v.

3 Burling, 216 Cal. App. 3d 1586, 1600, 265 Cal. Rptr. 719, 727 (Ct. App. 1990).  General

4 damages generally consist damages for, among other things, emotional distress or mental

5 anguish, pain and suffering, and loss of earning power.  See id. (stating that "damages for pain,

6 suffering and emotional distress are paradigmatic examples of general damages."); Connoly v.

7 Pre-Mixed Concrete Co., 49 Cal.2d 483, 489, 319 P.2d 343, 346 (Cal. 1957) ("Loss of earning

8 power is an element of general damages which can be inferred from the nature of the injury,

9 without proof of actual earnings or income either before or after the injury.").  As noted by one

10 district judge in the context of a bench trial, the amount of general damages awarded for items

11 such as pain and suffering "depends to a great extent on the trial court's observation of the

12 plaintiff and its subjective determination of the amount needed to achieve full compensation."

13 See KDME, Inc. v. Bucci, No. 05CV199 IEG (AJB), 2008 WL 205261, at *7 (S.D. Cal. Jan. 24,

14 2008) (unpublished) (citing Hyde v. Chevron U.S.A., Inc., 697 F.2d 614, 632 (5th Cir. 1983)).

15    The undersigned heard several hours of testimony at the prove-up hearing.  As

16 noted above, in the Dillard matter, plaintiffs Marilyn Dillard and Stephen Dillard testified, and

17 Marilyn Dillard also testified on behalf of the minor plaintiffs, Ciera and Ariel Dillard.  In the

18 Galtieri-Carlson matter, plaintiffs Ruth Galtieri-Carlson and Deana Galtieri testified, and Deana

19 Galtieri also testified on behalf of minor plaintiff Christian Galtieri-Brown.

20    After considering these plaintiffs' testimony in the respective actions, the

21 undersigned concludes that none of the plaintiffs is entitled to an unsupported demand for $2

22 million dollars in general damages.  The testimony and declarations provided simply do not

23 establish each plaintiff's entitlement to an award of $2 million dollars in general damages.

24 However, the undersigned concludes that plaintiffs are entitled to some measure of general

25 damages—the only type of damages sought by plaintiffs—as a result of the injuries about which

26 they testified.  Therefore, although plaintiffs have not established through expert testimony or

12

1  medical records that exposure to the defendants' products caused all of their symptoms, they

2  have established that they suffered emotional distress and anguish which entitles them to general

3  damages.

4                    1.    Marilyn Dillard

5                    Of the Dillard plaintiffs, Marilyn Dillard testified to the greatest exposure to

6  defendants' products and the most severe symptoms or injuries resulting from exposure.

7  Marilyn Dillard, who was previously a school teacher, became a home business licensee of

8  defendants and sold and applied defendants' products; she was exposed to defendants' products

9  in or around July 2004.  (See Marilyn Dillard Decl. ¶¶ 6-7, Dillard, Dkt. No. 44, Doc. No. 44-3.)

10 She mixed the solutions used in applying the body wraps at issue and even drank a product

11 solution based on a representation of Victoria Morton, a now-dismissed individual defendant,

12 that defendants' product solutions were safe enough to drink.  After performing three body

13 wraps, Marilyn Dillard developed flu-like symptoms.  Marilyn Dillard testified that she

14 subsequently suffered myriad health problems including bronchitis, chronic vaginal yeast

15 infections, joint pain, and a miscarriage in November 2004.  Marilyn Dillard alleges that most of

16 her conditions have not responded to normal courses of treatment and that she continues to suffer

17 from intermittent extreme flu-like symptoms that often last for extended periods of time, extreme

18 chronic yeast infections, menstrual irregularities, and has been diagnosed with chronic fatigue

19 syndrome. All of which medical professionals have been unable to successfully treat.

20                   Marilyn Dillard has provided no medical records substantiating causation between

21 her exposure to the products and her symptoms, or substantiating the degree of her symptoms.

22 Nevertheless, the undersigned can assess and recommend an award of general damages.  Taking

23 Marilyn Dillard's declaration and testimony into account, the undersigned recommends that

24 Marilyn Dillard be awarded general damages in the amount of $200,000.

25                    2.    Stephen Dillard

26                   Plaintiff Stephen Dillard's testimony reflects that Stephen Dillard was exposed to

                                                   13

defendants' products after Marilyn Dillard started her body-wrapping business in the family
home, for a period of between six months and two years.  Stephen Dillard was exposed to the
products when he would come home from work and assist Marilyn Dillard in mixing the
solutions used in the body wrapping process.  Insofar as the symptoms resulting from exposure to
defendants' products, Stephen Dillard's declaration and testimony represent that Stephen Dillard
has a reduced activity level since exposure, now suffers from Attention Deficit Disorder, that his
"head feels cloudy," that he suffers from an inability to focus, concentrate, and remember
information, recently suffers from dizziness and balance problems, and that he suffers from
chronic and acute flu-like symptoms, chronic skin lesions and sores on his head, and
"hypersensitivity."  (See Stephen Dillard Decl. ¶¶ 6, 8, 10, Dillard, Dkt. No. 44, Doc. No. 44-4.)
Although unsubstantiated by any medical evidence, Stephen Dillard testified that these symptoms
were caused by his exposure to defendants' products, persist today, and have not been effectively
treated by health professionals.  On the basis of Stephen Dillard's declaration and testimony, the
undersigned recommends that Stephen Dillard be awarded general damages in the amount of
$50,000.

    3.    Ariel and Ciera Dillard

The declaration submitted by Marilyn Dillard on behalf of minor plaintiff Ariel
Dillard represents that Ariel Dillard was exposed to defendants' products beginning at age six,
when Marilyn Dillard started her body-wrapping business in the family home in 2004.  (See
Decl. of Marilyn Dillard on Behalf of Ariel Dillard (A Minor) ¶ 2, Dillard, Dkt. No. 44, Doc. No.
44-1.)  That declaration and Marilyn Dillard's testimony on Ariel Dillard's behalf aver that Ariel
Dillard has suffered symptoms from her exposure to defendants' products that include chronic
and acute flu-like symptoms, memory problems, reduced dexterity, motor skill problems, fatigue,
and "hypersensitivity."  (See id. ¶¶ 3-8.)  Of course, plaintiffs have submitted no medical
evidence substantiating these symptoms.  Nevertheless, on the basis of the declaration submitted
by plaintiffs and Marilyn Dillard's testimony on Ariel Dillard's behalf, the undersigned

14

recommends that Ariel Dillard be awarded general damages in the amount of $50,000.

The declaration submitted by Marilyn Dillard on behalf of minor plaintiff Ciera Dillard represents that Ciera Dillard was directly exposed to defendants' products, beginning at age three, when she would assist Marilyn Dillard in preparing the solutions used in connection with the body wraps applied to customers.  (See Decl. of Marilyn Dillard on Behalf of Ciera Dillard (A Minor) ¶ 2, Dillard, Dkt. No. 44, Doc. No. 44-2.)  Marilyn Dillard testified that Ciera Dillard drank some of the defendants' product.  That declaration and Marilyn Dillard's testimony on Ciera Dillard's behalf assert that Ciera Dillard suffered extreme flu-like symptoms, including pneumonia, which ultimately led to an operation on one of Ciera Dillard's lungs.  (See id. ¶¶ 4-6.)  Ciera Dillard presently suffers from breathing difficulties that Marilyn Dillard attributes to early exposure to defendants' products, as well as self-esteem problems arising from scarring suffered as a result of the lung operation.  (Id. ¶¶ 7-8.)  Again, plaintiffs have submitted no medical evidence substantiating these symptoms.  However, in light of the declaration submitted by plaintiffs and Marilyn Dillard's testimony on Ciera Dillard's behalf, the undersigned recommends that Ciera Dillard be awarded general damages in the amount of $100,000.

4.   Ruth Galtieri-Carlson

As with the Dillard plaintiffs, the Galtieri-Carlson plaintiffs also testified to having suffered myriad adverse medical reactions to defendants' products.  As reflected in the declarations filed by plaintiffs in the Galtieri-Carlson matter and plaintiffs' testimony, plaintiffs Ruth Galtieri-Carlson and Deana Galtieri-Carlson were exposed to defendants' products through their salon business, where they administered defendants' body wrap products as licensees.  (See Decl. of Deana Galtieri ¶¶ 2-3 ("Galtieri Decl."), filed in Dillard, Dkt. No. 44, Doc. No. 44-5; Decl. of Ruth Galtieri-Carlson ¶¶ 2-3 ("Galtieri-Carlson Decl."), filed in Dillard, Dkt. No. 44, Doc. No. 44-7.)

Ruth Galtieri-Carlson's declaration and testimony at the prove-up hearing reflect that since her exposure to defendants' products, she has experienced maladies that are too

15

1   voluminous to recount here.  These conditions include flu-like symptoms, chronic fatigue,

2   respiratory issues, severe vertigo resulting in blackouts, Herpes Simplex (I and II), fungal

3   infections, muscle spasms and weakness, rectal burning and itching, anxiety, dizziness, mood

4   disorders, and various other conditions, all of which medical professionals have been unable to

5   treat.  (See Galtieri-Carlson Decl. ¶¶ 5-6.)

6          As with the Dillard plaintiffs, the Galtieri-Carlson plaintiffs have provided no

7   medical records substantiating causation between their exposure to the products and their

8   symptoms, or substantiating the degree of their symptoms.  Nevertheless, the undersigned can

9   assess and recommend an award of general damages.  Taking Ruth Galtieri-Carlson's declaration

10  and testimony into account, the undersigned recommends that Ruth Galtieri-Carlson be awarded

11  general damages in the amount of $125,000.

12          5.    Deana Galtieri

13          Plaintiff Deana Galtieri alleges that as a result of her prolonged exposure to

14  defendants' products at her salon business, she has suffered various conditions, including

15  reduced activity, vertigo, suicidal ideation, chronic vaginal bacterial and yeast infections, extreme

16  flu-like symptoms, throbbing joint pain throughout her body, gastrointestinal issues, lethargy and

17  chronic fatigue, abnormal pap smears, severe cramping and menstrual pain, and various other

18  conditions, including she has been diagnosed with fibromyalgia, epstein-barr, and chronic fatigue

19  syndrome, all of which medical professionals have been unable to treat.  (See Galtieri Decl. ¶¶ 5-

20  6, 9-10.)  Deana Galtieri has submitted no medical records substantiating causation between her

21  exposure to the products and their symptoms, or substantiating the degree of her symptoms.

22  Nevertheless, the undersigned can assess and recommend an award of general damages.  Taking

23  Deana Galtieri's declaration and testimony into account, the undersigned recommends that Deana

24  Galtieri be awarded general damages in the amount of $200,000.

25          6.    Christian Galtieri-Brown

26          The declaration submitted by Deana Galtieri on behalf of her minor son, plaintiff

16

Christian Galtieri-Brown, reflects that Christian Galtieri-Brown was exposed to defendants' products as a result of his involvement in the daily activities at Ruth Galtieri-Carlson and Deana Galtieri's salon business.  (See Decl. of Deana Galtieri as Guardian Ad Litem for Christian Galtieri-Brown ¶¶ 7-8, filed in Dillard, Dkt. No. 44, Doc. No. 44-6.)  He was present during the mixture of solutions for the body wraps and even drank some of the solutions based on a representation agents of defendants that defendants' product solutions were safe enough to drink. (See id. ¶¶ 5-6.)  Deana Galtieri's declaration and testimony on behalf of Christian Galtieri-Brown aver that as a result of Christian Galtieri-Brown's exposure to defendants' products, he allegedly suffers from myriad symptoms including, among others, prolonged fevers, bacterial infections, fungal infections, acute respiratory conditions including pneumonia and bronchitis, cognitive impairment, speech problems, memory problems, unexplained rashes, an inability to control his bowels and bladder, and anxiety, all of which medical professionals have been unable to treat.  (See id. ¶¶ 10-15.)  Again, plaintiffs have submitted no medical evidence substantiating these symptoms or the severity of these symptoms.  However, in light of the declaration and testimony provided by Deana Galtieri on Christian Galtieri-Brown's behalf, the undersigned recommends that Christian Galtieri-Brown be awarded general damages in the amount of $75,000.

IV.     CONCLUSION

         For the foregoing reasons, IT IS HEREBY RECOMMENDED that:

         1.     The application for default judgment filed by plaintiffs in Dillard, et al. v. Victoria M. Morton Enterprises, Inc., et al., No. 2:08-cv-1339 KJM KJN PS (Dkt. Nos. 44, 54) be granted, and that default judgment, imposing joint and several liability, be entered in that case against the following defendants in that matter: Victoria M. Morton Enterprises, Inc., Suddenly Slender, and Suddenly Slender International.

         2.     That general damages in the amount of $200,000 be awarded to plaintiff Marilyn Dillard.

17

1          3.      That general damages in the amount of $50,000 be awarded to plaintiff

2    Stephen Dillard.

3          4.      That general damages in the amount of $50,000 be awarded to plaintiff

4    Ariel Dillard.

5          5.      That general damages in the amount of $100,000 be awarded to plaintiff

6    Ciera Dillard.

7          6.      The application for default judgment filed by plaintiffs in Galtieri-Carlson,

8    et al. v. Victoria M. Morton Enterprises, Inc., et al., No. 2:08-cv-1777 KJM KJN PS (Dkt.

9    Nos. 34, 40) be granted, and that default judgment, imposing joint and several liability, be

10   entered in that case against the following defendants in that matter: Victoria M. Morton

11   Enterprises, Inc., Suddenly Slender, and Suddenly Slender International.

12         7.      That general damages in the amount of $125,000 be awarded to plaintiff

13   Ruth Galtieri-Carlson.

14         8.      That general damages in the amount of $200,000 be awarded to plaintiff

15   Deana Galtieri.

16         9.      That general damages in the amount of $75,000 be awarded to plaintiff

17   Christian Galtieri-Brown.

18         10.     The Clerk of Court be directed to close this case.

19         These findings and recommendations are submitted to the United States District

20   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

21   days after being served with these findings and recommendations, any party may file written

22   objections with the court and serve a copy on all parties.  Id.; see also E. Dist. Local Rule 304(b).

23   Such a document should be captioned "Objections to Magistrate Judge's Findings and

24   Recommendations."  Any response to the objections shall be filed with the court and served on

25   all parties within fourteen days after service of the objections.  E. Dist. Local Rule 304(d).

26   Failure to file objections within the specified time may waive the right to appeal the District

1  Court's order.  <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d

2  1153, 1156-57 (9th Cir. 1991).

3             IT IS SO RECOMMENDED.

4  DATED:  February 3, 2011

5

6                                               

7                              KENDALL J. NEWMAN
                            UNITED STATES MAGISTRATE JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26